# In the United States District Court
# for the Southern District of Georgia
# Waycross Division

| | | |
|---|---|---|
| JOHN REID, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | CV 511-092 |
| | * | |
| CITY OF ALMA, | * | |
| GRADY HEAD, | * | |
| City Councilman of Alma, Georgia, | * | |
| NICK OVERSTREET, | * | |
| City Manager of Alma, Georgia, | * | |
| WAYNE WILLIAMS, | * | |
| Mayor of Alma, Georgia, and | * | |
| CARL LEGGETT, | * | |
| Motor Supervisor of Alma, Georgia, | * | |
| | * | |
| Defendants. | * | |

## ORDER

Presently before the Court is Defendants' Motion for Summary Judgment. See Dkt. No. 30. Upon due consideration, Defendants' motion is **GRANTED**.

1

# I. FACTUAL BACKGROUND

This action is predicated on Defendants' alleged racial discrimination. <u>See</u> Dkt. No. 15. The material facts are not in dispute.[1] <u>See</u> Dkt. Nos. 30-1, 30-2.

Plaintiff is a black male. Dkt. No. 15, at 4. In 2003, he was hired as Defendant City of Alma's ("City") sole limb truck driver. Dkt. No. 30-2, at 20, 32. Plaintiff never applied for nor worked in any other job for the City. <u>Id.</u> at 21.

As limb truck driver, Plaintiff removed limbs as needed throughout the City. <u>Id.</u> at 30-32. He also raked and cleaned each work site. <u>Id.</u> Plaintiff followed an assigned route to collect limbs around the City. <u>Id.</u> at 21. This route required Plaintiff to visit particular sections of the City on particular days of the week. <u>Id.</u> at 22. Plaintiff's work responsibilities remained constant throughout his employment. <u>Id.</u> at 21.

---

[1] Plaintiff failed to respond to Defendants' motion (Dkt. No. 30) or Defendants' statement of material facts supporting that motion (Dkt. No. 30-1). Pursuant to Federal Rule of Civil Procedure 56(e) and Local Rule 56.1, all material facts not specifically controverted by specific citation to the record are deemed admitted, unless otherwise inappropriate.

AO 72A
(Rev. 8/82)

In general, Plaintiff's work occurred throughout the City in places other than the City Shop.[2] Id. at 29-30. However, Plaintiff frequently visited the City Shop to repair and clean his truck, to communicate with the City mechanic, and to use the City Shop's restroom facilities. Id. at 30-31.

Defendant Head served as an elected City Council Member.[3] Id. at 25-26. Plaintiff and Defendant Head saw each other daily at the City Shop. Id. at 33.

In 2004 or 2005, Defendant Head came to the City Shop on personal business. Id. at 29. Plaintiff and other City employees were present during Defendant Head's visit. Id. at 26, 28. In the presence of these City employees, Defendant Head said that he fired his maid. Id. at 26. He then looked at and approached Plaintiff and said that his maid was "a sorry ass nigger."[4] Id. Defendant Head made no other derogatory or

---

[2] The City Shop is centrally located in the city of Alma. Dkt. No. 30-2, at 31. The record does not indicate the City Shop's functions, but the most reasonable inference from the record is that City employees used the shop routinely, that City trucks were serviced and cleaned there, and that many City supervisors could be found there.

[3] Plaintiff's Complaint refers to Defendant Head as "Mayor." See, e.g., Dkt. No. 15, at 6-8, 13. However, Plaintiff's deposition confirms that Defendant Head was a City Council Member and not the City's mayor. Dkt. No. 30-2, at 25-26; see also Dkt. No. 15, at 5 (describing Defendant Head as "City Councilman of the City of Alma").

[4] Plaintiff believes that Defendant Head's anger towards his former maid resulted from the maid stealing his medication. Dkt. No. 30-2, at 27.

3

AO 72A
(Rev. 8/82)

discriminatory remarks at this time. Id. Plaintiff did not report Defendant Head's statement to any City official or supervisor. Id. at 28.

During the remainder of Plaintiff's employment with the City, Plaintiff did not hear Defendant Head make any other discriminatory statements. Id. at 27, 109. Nor did Plaintiff hear Defendant Head use the word "nigger" again. Id. at 34.

In early 2006, Plaintiff voluntarily left his job with the City to work as a limb truck driver in Baxley, Georgia. Id. at 22-23, 28. Plaintiff's change in employment was unrelated to Defendant Head or Defendant Head's derogatory statement. Id. at 28. Subsequently, Plaintiff was fired from his job in Baxley. Id. at 23. He took other jobs and attended a work program until the City offered him his prior job as the City's limb truck driver. Id. at 23-24.

In March 2006, Plaintiff began his second tenure as the City's limb truck driver. Id. at 24-25. On September 17, 2007, Plaintiff sat in the City Shop. Id. at 109. Defendant Head touched Plaintiff by "massaging" him. Id. at 110. Plaintiff told Defendant Head to stop. Id. Defendant Head did not stop. Id. Instead, he pinched Plaintiff's neck. Id. Plaintiff again told Defendant Head to stop because he did not like the

4

touching.  Id.  Plaintiff also told Defendant Head not to touch
him anymore.  Id.  Plaintiff does not know whether Defendant
Head's touching was horseplay.  Id. at 111.  However, Plaintiff
found it to be unwelcome contact.  Id.  Plaintiff reported the
incident to the City's Public Works Supervisor, Defendant
Leggett.  Id. at 110; Dkt. No. 15, at 5.  Defendant Head never
touched Plaintiff again.  Dkt. No. 30-2, at 110.

One year later, on the morning of September 8, 2008,
Plaintiff left his limb truck running outside of the City Shop.
Id. at 37-39.  Defendant Head saw the truck running.  Id. at 38-
39.  He said to Plaintiff, "Get out of here and start picking up
limbs.  Why is the truck running?  The City can't afford the
truck running."  Id. at 37-38.  Defendant Head also said to
Plaintiff, "Get your ass back out there on the truck."  Id. at
43, 54-55.  Later that day, Plaintiff spoke to Defendant Head
about their morning encounter.  Id. at 38.  Plaintiff asked
Defendant Head why he treated Plaintiff that way in front of the
other employees.  Id.  Plaintiff also said, "Don't do it again
because it's harassment and I'm tired of it."  Id.  Plaintiff
did not explain why he left his truck running that morning.  Id.
at 41-42.

5

On September 17, 2008, Plaintiff told the City Mayor, Defendant Williams, about Plaintiff's September 8 conversations with Defendant Head. Id. at 42-44. Plaintiff also told Defendant Williams that he was "having a lot of problems with [Defendant] Head." Id. at 43. Plaintiff specifically mentioned that Defendant Head came to the City Shop to harass only Plaintiff. Id. Plaintiff asked Defendant Williams to talk to Defendant Head about these issues and to try to "end this." Id. Plaintiff did not tell Defendant Williams about Defendant Head's touching Plaintiff on September 17, 2007. Id. at 111. Defendant Williams said that he would address Defendant Head regarding these problems. Id. at 44. However, Defendant Williams never followed-up with Plaintiff regarding his complaint. Id. at 45.

In October 2008, Defendant Leggett told Plaintiff that Defendant Head sent him an "attaboy." Id. at 50-52. Plaintiff found this remark to be derogatory and insulting.[5] Id. at 51-52.

On October 17, 2008, Defendant Leggett informed Plaintiff that he could not take breaks at the City Shop until "everything

_____

[5] Plaintiff has used the term "attaboy." Id. at 50. He has said it to his dog, and he may have said it on the basketball court. Id. When Plaintiff has used the term, he intended to send a compliment. Id.

was straightened out" between Plaintiff and Defendant Head.  Id. at 45-47.  Plaintiff requested a meeting with Defendants Overstreet, Williams, and Leggett to discuss the matter.  Id. at 46.  The requested meeting occurred on approximately October 21, 2008.  Id. at 46-49.  At the meeting Plaintiff said that Defendant Head followed Plaintiff on his route and continuously complained.  Id. at 47.  Defendant Williams said that "he wasn't going to do [any]thing" and left the meeting.  Id. at 49.  The City Manager, Defendant Overstreet,[6] took over the meeting and said that he would "handle it."  Id.  Defendant Overstreet also said that he would "look into this matter."  Id. at 47-48.  Defendant Head never again harassed Plaintiff in person.  Id. at 49.

At the meeting, Defendant Overstreet told Plaintiff that he could take breaks at the City Shop.  Id. at 47.  Also at the meeting, Plaintiff requested a few days of leave.  Id. at 48.  Defendant Overstreet gave Plaintiff unpaid administrative leave.  Id. at 48-49.

---

[6] Defendant Overstreet became City Manager in September 2008.  Dkt. No. 30-2, at 46-47.

On March 25, 2009, Plaintiff signed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). Id. at Ex. 2. This Charge alleged dates of discrimination from September 8 to October 31, 2008. Id. The Charge refers to Defendant Head telling Plaintiff to "get [his] ass back in [his] truck," Defendant Head's "attaboy" comment,[7] and Defendant Leggett's instruction that Plaintiff could no longer take breaks in the City Shop. Id.

On June 17, 2009, Plaintiff received his first disciplinary action. See id. at 55-59, Ex. 3. The Action stated that Plaintiff refused to operate his limb truck because the truck's boom was inoperable. Id. Ex. 3. The Action further stated that Plaintiff refused to perform his job duties with a flatbed dump truck and pitchfork until the boom was repaired.[8] Id. Plaintiff believes that the discipline was unnecessary because his inaction "[was not] really that serious." Id. at 59. Plaintiff signed this Action on June 25, 2009. Id. at Ex 3. Plaintiff could not say and did not know whether his crew leader (who

---

[7] The Charge specifically refers to a "thata boy" comment. Id. at Ex. 2. Plaintiff's deposition clarifies that the "attaboy" and "thata boy" comments refer to the same incident. See id. at 49-50.
[8] Plaintiff asserts that using a flatbed dump truck was not a serious option. Id. at 58.

AO 72A
(Rev. 8/82)

filed the Action) or Defendant Leggett (who signed the Action as Department Head) filed the Action to discriminate against Plaintiff. Id. at 59.

On June 23, 2009, Plaintiff received his second disciplinary action. See id. at 56-59, Ex. 4. The Action stated that Plaintiff disobeyed a supervisor's instruction and violated the City's purchase order policy. Id. at Ex. 4. Plaintiff signed this Action on June 25, 2009. Id. Plaintiff could not say and did not know whether the action was filed for a discriminatory reason. Id. at 63.

On August 11, 2009, Plaintiff received his third disciplinary action. Id. at 63-64, Ex. 6. The Action described (1) Plaintiff's repeated failures to remove limbs on his assigned routes, (2) complaints from citizens whose limbs were not removed,[9] (3) Plaintiff's false statement to his supervisor that he completed his daily route when he had not, and (4) Plaintiff taking breaks well in excess of the fifteen (15) minutes allowed.[10] Id. at Ex. 6. The Action included a "Plan of

---

[9] Plaintiff contends that one (1) of these citizen complaints was a "setup." Id. at 71.
[10] Plaintiff asserts that Defendant Overstreet gave him permission to take extended breaks. Id. at 73-74. However, Plaintiff does not recall whether

Action" to improve Plaintiff's job performance. See id. This Plan required Plaintiff to follow his assigned daily route and remove limbs at each residence along the route. Id. The Plan permitted two (2) fifteen (15) minute breaks per day and required breaks to be taken along the limb truck route or at the City Shop, if the City Shop was on the assigned route. Id. The Plan gave Plaintiff sixty (60) days to improve his job performance. Id. Plaintiff did not disagree with receiving the Plan of Action. Id. at 75-76. Plaintiff signed this Disciplinary Action and its associated Plan on August 11, 2009. Id. at Ex. 6.

Plaintiff did not report to work after August 13, 2009. Id. at 79-80.[11] On August 17, 2009, Plaintiff requested three (3) months of leave. See id. at Ex. 9. The City notified Plaintiff that he was not eligible for leave under the Family and Medical Leave Act.[12] Dkt. No. 30-2, at 76.

---

Defendant Overstreet made this accommodation before or after he received the Disciplinary Action on August 11, 2009. Id. at 74.

[11] Plaintiff asserts that he had permission to go to doctor's appointments after August 11, 2009. Id. at 78-79. However, Plaintiff also agrees with the contents of the City's October 7, 2009 letter. Id.

[12] On October 7, 2009, the City memorialized this conversation in a letter. In that letter, the City reiterated that Plaintiff was not eligible for leave under the Family and Medical Leave Act. Id. at Ex 8.

10

On August 21, 2009, Plaintiff submitted a letter to the City from his doctor. See Dkt. No. 15-1, at 5. In this letter, Plaintiff's doctor stated that Plaintiff had "multiple medical problems," including hypertension, diabetes, high cholesterol, and depression and "adjustment disorder" due to his father's recent death. Id. Plaintiff's doctor also stated that Plaintiff was advised "to go on medical leave for a period of three months at which time he will be reevaluated for work status." Id. On October 7, 2009, the City requested a meeting with Plaintiff to discuss his requested leave. Dkt. No. 30-2, at Ex 8. The City also notified Plaintiff that it needed additional information regarding his medical condition before the City could determine what reasonable accommodation, if any, was available. Id.

On November 20, 2009, Plaintiff submitted a second letter to the City from his doctor. Dkt. No. 15-1, at 4. In this letter, Plaintiff's doctor noted Plaintiff's many medical conditions, including prostate cancer. Id. The doctor described Plaintiff's radiation treatment and the symptoms that Plaintiff would suffer as a result of this treatment. Id. The doctor stated that Plaintiff would be "unable to perform required job duties during his cancer treatment." Id. The

11

doctor also requested that Plaintiff be excused from work during the treatment and its associated follow-up care. Id.

On November 23, 2009, Plaintiff signed a second Charge of Discrimination with the EEOC. Dkt. No. 30-2, Ex. 14. This Charge alleged dates of discrimination from June 9 to August 17, 2009. Id. The Charge alleged disparate treatment and harassment, in violation of Title VII, and denial of reasonable accommodation for Plaintiff's disabilities, in violation of the American with Disabilities Act. Id.

On December 18, 2009, Plaintiff submitted a third letter to the City from his doctor. Dkt. No. 15-1, at 1. In this letter, Plaintiff's doctor summarized Plaintiff's medical condition and cancer treatment. Id. After reviewing Plaintiff's job duties, the doctor stated that "extreme modifications" should be made to those duties. Id. Specifically, the doctor advised that Plaintiff needed complete flexibility for his daily cancer treatments and associated follow-up medical appointments, direct access to bathroom facilities, a job that required "absolutely no lifting, bending, squatting, climbing or straining" in a "low to no stress environment," and an "allowance to take frequent breaks or shortened work hours." Id.

12

From the time that Plaintiff requested leave for medical reasons until his termination, the City attempted to work with Plaintiff to understand his medical limitations to determine whether Plaintiff could perform his essential job functions and whether a reasonable accommodation was possible. See Dkt. No. 30-2, Exs. 8-12.[13]

On December 31, 2009, Plaintiff was terminated. Dkt. No. 30-2, at 100-01. Defendant Overstreet sent a letter to Plaintiff describing the reasons for his termination. Id. at Ex. 12. That letter summarized the City's attempt to work with Plaintiff to understand his needs for leave and his doctor's conclusion that he could not perform his essential job functions. Id. The letter cited multiple letters and conversations between the City and Plaintiff regarding Plaintiff's requested leave of absence. Id. Defendant Overstreet concluded:

> The City of Alma considers that your continued indefinite leave, along with your past over four months of leave, is not a reasonable accommodation to perform the essential functions of your position. Due

---

[13] Plaintiff contests some factual matter in the City's letters. However, he does not contend that he reported to work physically able to perform his job after August 13, 2009. See id. at 81-97.

13

> to the lack of information that would allow
> the City of Alma to reasonably accommodate
> you[,] I am terminating your employment
> because there is no other work for which you
> are qualified to perform.

Id.

On February 25, 2010, Plaintiff signed a third Charge of

Discrimination with the EEOC. Dkt. No. 30-2, Ex. 15. Id. The

Charge alleged that Plaintiff's termination on December 31, 2009

was discriminatory. Id.

Other than the statements recounted above, Plaintiff never

heard, directly or indirectly, any other statements by Defendant

Head which Plaintiff finds objectionable on the basis of race.

Id. at 109. To Plaintiff's knowledge, Defendants Leggett and

Williams never discriminated against Plaintiff. Id. at 24, 45.

To Plaintiff's knowledge, Defendant Overstreet never made any

racially hostile comments or acts to, about, or around

Plaintiff. Id. at 53. Plaintiff admits that any reason for his

termination other than that provided by the City is speculation

on his part. Id. at 104.

## II. PROCEDURAL BACKGROUND

Plaintiff brought his initial Complaint on September 12,

2011. See Dkt. No. 1. On December 22, 2011, Plaintiff filed an

14

Amended Complaint.  Dkt. No. 15.  The Amended Complaint added and removed claims and named additional Defendants.  See Dkt. No. 15.  Plaintiff brought his Amended Complaint against Defendant City of Alma ("City") and against Defendants Overstreet, Leggett, Williams, and Head in their individual capacities and in their official capacities as officials and employees of the City.  See id. at 4-5.

The Amended Complaint states two (2) federal law causes of action:  racial discrimination and gender discrimination.  See Dkt. No 15.  The Amended Complaint states (2) state law causes of action:  intentional infliction of emotional distress and negligence.  See id.  Plaintiff seeks declaratory relief as well as compensatory and punitive damages.  See id.

In a June 14, 2012 Order, this Court dismissed Plaintiff's claim of gender discrimination.  See Dkt. No. 27.  The Court also dismissed Plaintiff's state law claims against the City and the other Defendants in their official capacities.  See id. Accordingly, the Court dismissed Plaintiff's claims for punitive damages against the City and the other Defendants in their official capacities.  See id.

In a June 29, 2012 Order, this Court granted the parties Consent Motion (Dkt. No. 28) to dismiss Plaintiff's Amended

15

Complaint against Defendants Overstreet, Leggett, and Williams in their individual capacities. Dkt. No. 29. Consequently, the claims presently pending are (1) Plaintiff's claim of racial discrimination against the City and all named Defendants in their official capacities and against Defendant Head in his individual capacity, (2) Plaintiff's state law claims against Defendant Head in his individual capacity, and (3) Plaintiff's claim for punitive damages against Defendant Head in his individual capacity.

Currently before the Court is Defendants' Motion for Summary Judgment as to all remaining claims. See Dkt. No. 30. Plaintiff failed to respond to this motion.

## III. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." FindWhat Investor Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A dispute over such a fact is "genuine" if the

16

"evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. In making this determination, the court is to view all of the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. Johnson v. Booker T. Washington Broad. Serv., Inc., 234 F.3d 501, 507 (11th Cir. 2000).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). To satisfy this burden, the movant must show the court that there is an absence of evidence to support the nonmoving party's case. Id. at 325. If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. Anderson, 477 U.S. at 257.

## III. DISCUSSION

### A. Title VII Claims

Plaintiff alleges that, while he was employed by the City, he was subjected to racial discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§

AO 72A
(Rev. 8/82)

2000e et seq. ("Title VII"). <u>See</u> Dkt. No. 15. Defendants assert that Plaintiff's claims fail as a matter of law. The Court agrees. For the reasons stated below, Defendants' motion for summary judgment on Plaintiff's claims of racial discrimination in violation of Title VII is **GRANTED**.

1. Claims Against the City

   a. Disparate Treatment

"[A] plaintiff establishes a prima facie case of race discrimination under Title VII by showing: (1) he belongs to a racial minority; (2) he was subjected to adverse job action; (3) his employer treated similarly situated employees outside his classification more favorably; and (4) he was qualified to do the job. <u>Holifield v. Reno</u>, 115 F.3d 1555, 1562 (11th Cir. 1997) (per curiam) (citing <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973) and other cases).

It is not clear whether the Plaintiff attempts to set forth a disparate treatment claim under Title VII. To the extent that Plaintiff attempts to set forth such a claim, Plaintiff fails to establish a prima facie case. In particular, Plaintiff offered no evidence that the City treated a similarly-situated, non-minority employee more favorably than the City treated

18

Plaintiff.  See id. at 1563 ("[The plaintiff] has failed to produce sufficient affirmative evidence to establish that the non-minority employees with whom he compares his treatment were similarly situated in all aspects, or that their conduct was of comparable seriousness to the conduct for which he was discharged.  Having failed to meet his burden of proving he was similarly situated to a more favorably treated employee, [the plaintiff] has not established a prima facie case.").  Moreover, there is no other evidence that any of the City's adverse employment actions were discriminatory.  See id. at 1562 ("If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present." (emphasis omitted)).  Consequently, the City is entitled to summary judgment as to Plaintiff's disparate treatment claim.

b. Hostile Work Environment

To establish a hostile work environment claim, a plaintiff must show that: "(1) he belongs to a protected group; (2) he [was] subject to unwelcome harassment; (3) the harassment [was] based on [his] . . . race; (4) the harassment [was] sufficiently severe or pervasive to alter the terms and conditions of

19

employment and create a discriminatorily abusive work environment; and (5) the employer is responsible for such environment under a theory of vicarious liability or a theory of direct liability." Washington v. Kroger Co., 218 F. App'x 822, 824-25 (11th Cir. 2007).

The requirement that the harassment be severe or pervasive contains an objective and subjective component. Id. at 825. To be actionable, the "behavior must result in both an environment that a reasonable person would find hostile or abusive and an environment that the victim subjectively perceives to be abusive." Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1276 (11th Cir. 2002). Conduct is severe when the work environment is "permeated with discriminatory intimidation, ridicule and insult, not where there is the 'mere utterance of an . . . epithet." Id. at 1276-77 (citation and quotation marks omitted); see also Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993) ([T]he "mere utterance of an . . . epithet which engenders offensive feelings in an employee . . . does not sufficiently affect the conditions of employment."). "'[S]imple teasing,' . . . offhand comments, and isolated incidents (unless extremely serious) [do] not amount to discriminatory changes in the 'terms and conditions of employment.'" Faragher v. City of

Boca Raton, 524 U.S. 775, 788 (1998) (internal citation omitted).

Here, Plaintiff subjectively perceived his working environment to be hostile. See Dkt. No. 15. Defendants do not dispute this fact. However, the evidence fails to show an objectively hostile or abusive work environment.

In determining whether a work environment was objectively hostile, the Eleventh Circuit has found the following factors relevant: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." Mendoza v. Borden, Inc., 195 F.3d 1238, 1246 (11th Cir. 1999). In analyzing the frequency of the conduct, there is no "magic number" of racial insults that preclude summary judgment. Miller, 277 F.3d at 1276 (citation and quotation omitted). Instead, precedent requires a court to evaluate the evidence "in context, [and] not as isolated acts, and . . . under the totality of the circumstances." Mendoza, 195 F.3d at 1246.

AO 72A
(Rev. 8/82)

The following evidence supports Plaintiff's hostile work environment claim:[14]

- In 2004 or 2005, in the presence of City employees, Defendant Head looked at and approached Plaintiff and said that his maid was "a sorry ass nigger." Dkt. No. 30-2, at 26.

- On September 17, 2007, Defendant Head touched Plaintiff by "massaging" him. Id. at 110. Defendant Head did not stop when Plaintiff first asked him to do so. Id. at 110.

- On September 8, 2008, Plaintiff left his limb truck running outside of the City Shop. Id. at 37-39. Defendant Head said to Plaintiff, "Get out of here and start picking up limbs. Why is the truck running? The City can't afford the truck running." Id. at 37-38. He also said, "Get your ass back out there on the truck." Id. at 43, 54-55.

- In October 2008, Defendant Leggett told Plaintiff that Defendant Head sent him an "attaboy." Id. at 50-52.

_____

[14] The Court notes that many of these incidents lack factual information sufficient to show that they occurred because of Plaintiff's race.

22

- On October 17, 2008, Defendant Leggett told Plaintiff that he could not take breaks at the City Shop until "everything was straightened out" between Plaintiff and Defendant Head. <u>Id.</u> at 45-47.

Plaintiff worked for the City for more than (6) years. During that period, Plaintiff was subjected to three (3) remarks that he viewed to be discriminatory and disparaging. He was also touched inappropriately one (1) time. Also, for at least some period of time, Plaintiff was not allowed to take breaks at the City Shop. However, the occurrence of five (5) incidents over six (6) years does not reveal pervasive conduct. <u>See Cargo v. Ala., Bd. of Pardons & Parole Div.</u>, 391 F. App'x 753, 755 (11th Cir. 2010) ("Five or six incidents over the course of three to four years is hardly frequent conduct.").

Moreover, nothing suggests that the incidents were severe. Though offensive, the comments did not rise beyond the level of insults. They were not physically threatening or humiliating. Other than a restriction on where Plaintiff took restroom breaks, none of the actions interfered with Plaintiff's ability to perform his job. Consequently, the facts fail to reveal an objectively hostile or abusive work environment. <u>Compare Coley v. Fortson-Peek Co.</u>, No. 4:10-CV-65 CDL, 2011 WL 4899752 (M.D.

23

Ga. Oct. 14, 2011) (finding that the occurrence of two (2) incidents over three (3) years was "too sporadic and isolated to establish discrimination so objectively severe and pervasive as to alter the terms and conditions of [the plaintiff's] employment"), with Shockley v. HealthSouth Cent. Ga. Rehab. Hosp., 293 F. App'x 742, 747 (11th Cir. 2008) (finding a question of fact as to the severity and pervasiveness of harassment where the plaintiff alleged "frequent, severe, threatening, and humiliating verbal harassment by her supervisor" in the form of "several racially charged comments," numerous "you people" comments, an allegation that her supervisor spoke to her in a threatening manner).

Because the evidence fails to show an objectively hostile or abuse work environment, the City is entitled to summary judgment as to Plaintiff's hostile work environment claim.

c. Disparate Impact

To establish a prima facie case of disparate impact, the plaintiff "must establish that (1) there is a significant statistical disparity [among different racial groups]; (2) there is a specific, facially neutral employment practice; and (3) a causal nexus exists between the employment practice and the

24

statistical disparity." Jefferson v. Burger King Corp., No. 12-12540, 2013 WL 323224 (11th Cir. Jan. 29, 2013) (citing EEOC v. Joe's Stone Crabs, Inc., 220 F.3d 1263, 1273 (11th Cir. 2000)). "The plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group." Id. (citation omitted). "Statistical disparities must be sufficiently substantial to raise such an inference of causation." Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 995 (1988).

It is not clear whether the Plaintiff attempts to set forth a disparate impact claim. To the extent that Plaintiff attempts to set forth such a claim, Plaintiff fails to establish a prima facie case. In particular, there is no statistical evidence supporting any inference that the City's employment practices produced a disparate impact on black employees. Absent such statistical evidence, this City is entitled to summary judgment as to Plaintiff's disparate impact claim. See Turner v. City of Auburn, 361 F. App'x 62, 65 (11th Cir. 2010) (upholding summary judgment in favor of defendants where the "[p]laintiff proffered no statistical evidence in support of his disparate impact

claim[ and] failed to show that the challenged practices resulted in a statistical disparity among members of different racial groups").

   d. Retaliation

  To establish a prima facie case of retaliation, a plaintiff must show that (1) he engaged in statutorily protected activity, (2) he suffered a materially adverse action, and (3) there was a causal link between the two events. <u>Butler v. Ala. Dep't of Transp.</u>, 536 F.3d 1209, 1212-13 (11th Cir. 2008).

  It is not clear whether the Plaintiff attempts to set forth a retaliation claim. To the extent that Plaintiff attempts to set forth a retaliation claim on the basis of his filing EEOC charges, Plaintiff fails to establish a prima facie case. In particular, Plaintiff failed to establish a causal link between his EEOC charges and any potential "retaliatory" action by Defendants.

  While employed with the City, Plaintiff received three (3) disciplinary actions. Plaintiff could not say whether the first or second disciplinary actions were intended to discriminate against him based upon his race. <u>See</u> Dkt. No. 30-2, at 59, 61. Plaintiff did not disagree with his third disciplinary action.

AO 72A
(Rev. 8/82)

See id. at 76.  Finally, Plaintiff could only speculate that his termination was related to any complaint.  See id. at 102-04; see also id. (opining that his termination may have been related to supporting Defendant Head's opponent in the 2009 City Council election).  Thus, the evidence, by Plaintiff's own admission, does not show a causal connection between Plaintiff's EEOC complaints and any adverse employment action.  Consequently, the City is entitled to summary judgment as to Plaintiff's retaliation claim.

2.  Official Capacity Claims

Title VII applies to individuals sued in their official capacities.  See Cross v. Ala. Dep't of Mental Health & Mental Retardation, 49 F.3d 1490, 1504 (11th Cir. 1995).  However, claims against both the employer and an employee in his official capacity are redundant and subject to dismissal.  See Moore v. State of Ala., 989 F. Supp. 1412, 1416 (M.D. Ala. 1997), aff'd sub nom. Moore v. Ala., 178 F.3d 1303 (11th Cir. 1999) ("[I]f a plaintiff directly names his or her employer as a defendant, any of the employer's supervisory officials also named in the complaint may be dismissed from the action."  (citing Marshall v. Miller, 873 F. Supp. 628, 632 (M.D. Fla. 1995))); Moss v. W &

27

A Cleaners, 111 F. Supp. 2d 1181, 1187 (M.D. Ala. 2000) ("[W]hile official-capacity suits against an employer's agents are proper, such suits are unnecessary where a plaintiff has also sued the employer. In other words, if a Title VII plaintiff names his or her employer as a defendant, any of the employer's agents also named in the complaint may be dismissed from the action.")

Plaintiff alleges that the four (4) individually named Defendants violated Title VII in their official capacities. However, Plaintiff brought this same claim against the City. Thus, the claims against the individually named Defendants are redundant. Consequently, Defendants Head, Leggett, Overstreet, and Williams entitled to summary judgment on Plaintiff's Title VII claims against them in their official capacities.

3. Individual Capacity Claims

Plaintiff alleges that Defendant Head violated Title VII in his individual capacity. However, Title VII applies only against the employer. Dearth v. Collins, 441 F.3d 931, 933 (11th Cir. 2006). It is not available against individual employees. Id.; see also Hinson v. Clinch Cnty. Bd. of Educ., 231 F.3d 821, 827 (11th Cir. 2000) ("The relief under Title VII

28

is against the employer, not [against] individual employees whose actions constitute a violation of the Act."); Busby v. City of Orlando, 931 F.2d 764, 772 (11th Cir. 1991) (holding that "[i]ndividual suits under Title VII are . . . inappropriate"). Therefore, Defendant Head cannot be held liable in his individual capacity under Title VII. Consequently, Defendant Head is entitled to summary judgment on Plaintiff's Title VII claims.

B. Section 1981 Claims

Plaintiff alleges that, while he was employed by the City, he was subjected to racial discrimination in violation of 42 U.S.C. § 1981. See Dkt. No. 15. Defendants assert that Plaintiff's claims fail as a matter of law. The Court agrees. For the reasons stated below, Defendants' motion for summary judgment on Plaintiff's claims of racial discrimination in violation of § 1981 is **GRANTED**.

1. Claims Against the City

"Title VII and § 1981 'have the same requirements of proof and use the same analytical framework." Chapter 7 Trustee v. Gate Gourmet, Inc., 683 F.3d 1249, 1256-57 (11th Cir. 2012).

29

Accordingly, the Court's analysis of Plaintiff's Title VII claims applies with equal force to Plaintiff's § 1981 claims. See Blue v. Dunn Const., Co., Inc., 453 F. App'x 881, 883 (11th Cir. 2011) (addressing Title VII claims with the understanding that the same analysis applies to § 1981 claims). As noted above, the City is entitled to summary judgment on Plaintiff's Title VII claims. See supra Part III.A.1. Consequently, the City is also entitled to summary judgment on Plaintiff's § 1981 claims.

## 2. Official Capacity Claims

Plaintiff alleges that the individually named Defendants violated § 1981 in their official capacities. However, 42 U.S.C. § 1981 does not provide a cause of action against state actors. See Bryant v. Jones, 575 F.3d 1281, 1288 n.1 (11th Cir. 2009) ("§ 1981 does not provide an implicit cause of action against state actors . . . ." (citing Butts v. Cnty. of Volusia, 222 F.3d 891, 894 (11th Cir. 2000))).

Defendants are state actors. See Thompson Bldg. Wrecking Co., Inc. v. Augusta, Ga., No. CV 108-019, 2010 WL 1286029, *7 n.12 (S.D. Ga. Mar. 31, 2010); cf. Lowe v. Aldridge, 958 F.2d 1565, 1572 (11th Cir. 1992) (defining state actor as "a state

AO 72A
(Rev. 8/82)

official," one who "has acted together with or has obtained significant aid from state officials," or one whose "conduct[] is otherwise chargeable to the State." (citing <u>Lugar v. Edmondson Oil Co.</u>, 457 U.S. 922, 937 (1982))). Therefore, the individually named Defendants cannot be held liable in their official capacities under § 1981. Consequently, Defendants Head, Leggett, Overstreet, and Williams are entitled to summary judgment on Plaintiff's § 1981 claims against them in their official capacities.

3.   Individual Capacity Claim

Plaintiff alleges that Defendant Head violated § 1981 in his individual capacity. "[I]ndividual employees can be held liable for discrimination under § 1981." <u>Leige v. Capitol Chevrolet, Inc.</u>, 895 F. Supp. 289, 293 (M.D. Ala. 1995); <u>see also</u> <u>Moss</u>, 111 F. Supp. 2d at 1188 ("Supervisors with the capacity to hire and fire or those who can recommend such decisions are subject to liability under § 1981.").

Plaintiff's § 1981 claim is subject to a four-year statute of limitations. <u>See</u> <u>Baker v. Birmingham Bd. of Educ.</u>, 531 F.3d 1336, 1338 (11th Cir. 2008) (noting that § 1981 actions have four-year statute of limitations).

AO 72A
(Rev. 8/82)

The facts reveal only one (1) racially-based remark or action by Defendant Head. See Dkt. No. 30-2, at 26, 27, 109. Specifically, Defendant Head made a racially derogatory remark in 2004 or 2005. See id. at 26. However, Plaintiff filed his suit on September 12, 2011. See Dkt. No. 1. Therefore, the limitations period on Plaintiff's § 1981 action expired more than one (1) year before Plaintiff filed his action. Consequently, Plaintiff's § 1981 claim against Defendant Head is time-barred, and Defendant Head is entitled to summary judgment on this claim.

C. Intentional Infliction of Emotional Distress

Plaintiff alleges that Defendant Head's conduct constituted intentional infliction of emotional distress ("IIED"). See Dkt. No. 15 ¶¶ 69-75. Defendants assert that Plaintiff's claim fails as a matter of law. The Court agrees. For the reasons stated below, Defendants' motion for summary judgment on Plaintiff's IIED claim is **GRANTED**.

1. Legal Standard

"[T]o recover on a claim of intentional infliction of emotional distress, a plaintiff must show evidence that:

(1) defendants' conduct was intentional or reckless;

(2) defendants' conduct was extreme and outrageous; (3) a causal connection existed between the wrongful conduct and the [plaintiff's] emotional distress; and (4) the [plaintiff's] emotional harm was severe." Ghodrati v. Stearnes, 723 S.E.2d 721, 723 (Ga. Ct. App. 2012) (footnote and internal quotation marks omitted); see also Blockum v. Fieldale Farms Corp., 573 S.E.2d 36, 39 (Ga. 2002). "It is a question of law whether a claim rises to the level of extreme and outrageous conduct necessary to support a claim of intentional infliction of emotional distress." Id. at 39 (citation omitted).

2. Application

Plaintiff asserts that his allegations of racial discrimination "constitute extreme and outrageous conduct" sufficient to sustain his IIED claim. See Dkt. No. 15 ¶ 71. As noted above, however, the evidence does not support Plaintiff's claim for racial discrimination. See supra Parts III.A.-III.B. Moreover, the evidence does not reveal "extreme or outrageous conduct." See generally Dkt. No. 30-2; but see Ghodrati v. Stearnes, 723 S.E.2d 721, 723 (Ga. Ct. App. 2012) (finding no extreme or outrageous conduct where defendant "repeatedly called

33

[the plaintiff] racist and derogatory names[] [and] posted inappropriate signs about [the plaintiff] on the employee restroom door[, and] . . . in the middle of the shop").

At best, the evidence shows three (3) derogatory remarks over six (6) years, one (1) incident of unwanted physical contact, and temporary denial of the use of the City Shop's facilities. However, "outrageous conduct sufficient to justify a claim of intentional infliction of emotional distress 'does not include mere insults, indignities, threats, annoyances, petty oppressions, or other vicissitudes of daily living.'" Ghodrati, 723 S.E.2d at 724 (citing Wilcher v. Confederate Packaging, 651 S.E.2d 790 (Ga. Ct. App. 2007). "Plaintiffs are expected to be hardened to a certain amount of rough language and to occasional acts that are definitely inconsiderate and unkind." Id. (citation and quotation marks omitted). Thus, even though Defendant Head's comments and actions were inappropriate, they were not "extreme and outrageous."

Evidence of other aspects of Plaintiff's prima facie case is also lacking. Specifically, Plaintiff presented no evidence of severe emotional distress. Moreover, to the extent that Plaintiff suffered mental distress, Plaintiff presented no

AO 72A
(Rev. 8/82)

evidence that his emotional harm was caused by any of Defendants' actions.

Without evidence of extreme or outrageous conduct, severe emotional distress, and a causal connection between the conduct and the emotional distress, Plaintiff fails to establish a prima facie case of IIED. Thus, his claim fails as a matter of law. Consequently, Defendant Head is entitled to summary judgment on Plaintiff's IIED claim.

## D. Negligence

Plaintiff alleges that Defendant Head was negligent. See Dkt. No. 15 ¶¶ 76-80. Defendants assert that Plaintiff's claim fails as a matter of law. The Court agrees. For the reasons stated below, Defendants' motion for summary judgment on Plaintiff's negligence claim is **GRANTED**.

### 1. Legal Standard

Plaintiff's negligence claim is subject to a two-year statute of limitations. See O.C.G.A. § 9-3-33; Ga. Dept. of Human Res. v. Poss, 434 S.E.2d 488, 490 (Ga. 1993) overruled on other grounds by Hedquist v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 528 S.E.2d 508 (Ga. 2000) (applying two-year

AO 72A
(Rev. 8/82)

statute of limitation for negligence action based on alleged failure to train, supervise, promulgate rules and regulations, and provide adequate facilities).

### a. Application

Plaintiff asserts that Defendant Head breached his duty "to prevent [his] employees from acting in any way to harm co-employees." Dkt. No. 15 ¶¶ 77, 79. Plaintiff also asserts that Defendant Head breached his "duty to ensure that complaints of race discrimination were properly handled." Id. ¶ 78-79.

All race-based comments occurred on or before October 31, 2008. See Dkt. No. 30-2, at 50-52, Ex. 2. Moreover, the only physical contact occurred on September 8, 2008. Dkt. No. 30-2, at 37-39. Thus, any alleged negligence in preventing employees from harming co-employees or in handling race discrimination complaints occurred on or before October 31, 2008. Yet, Plaintiff filed his suit on September 12, 2011. Thus, Plaintiff failed to file his negligence claim within the two-year limitations period. Consequently, his negligence claim is time-barred, and Defendant Head is entitled to summary judgment on this claim.

AO 72A
(Rev. 8/82)

## IV. CONCLUSION

For the reasons stated above, Defendants are entitled to judgment as a matter of law on all remaining claims. Because Plaintiff's claims fail as a matter of law, his claims for damages are moot. Consequently, Defendants' Motion for Summary Judgment is **GRANTED**. Dkt. No. 30. The Clerk of Court is directed enter a final judgment and to close the case.

**SO ORDERED**, this 4th day of March, 2013.

LISA GODBEY WOOD, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

AO 72A
(Rev. 8/82)